**NOT FOR PUBLICATION**

Order Filed on March 6, 2018
by Clerk, U.S. Bankruptcy
Court - District of New Jersey

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |  |
|---|---|---|---|
| In re: | : |  |  |
|  | : | CHAPTER 7 |  |
| Marek A. Drzensla, *aka* Marcus Drzensla | : |  |  |
| *aka* Marcus Drzensla T/A Exotic Customs | : |  |  |
|  | : | CASE NO.: | 15-16210 (SLM) |
| Debtor. | : |  |  |
|  | : |  |  |
| Richard Sudol, | : |  |  |
|  | : | ADV. PRO. NO.: | 15-02022 (SLM) |
| Plaintiff, | : |  |  |
| v. | : |  |  |
|  | : |  |  |
| Marek A. Drzensla, *aka* Marcus Drzensla | : |  |  |
| *aka* Marcus Drzensla T/A Exotic Customs | : |  |  |
|  | : |  |  |
| Defendant. | : |  |  |

**OPINION**

**A P P E A R A N C E S :**

Henry Gurshman
10 Station Place, Suite 17
PO Box 566
Metuchen, NJ 08840
*Counsel for Plaintiff Richard Sudol*

Barry Scott Miller
1211 Liberty Avenue
Hillside, NJ 07205
*Counsel for Defendant Marek A. Drzensla, aka Marcus Drzensla
aka Marcus Drzensla T/A Exotic Customs*

**STACEY L. MEISEL, UNITED STATES BANKRUPTCY JUDGE**

## <u>INTRODUCTION</u>

Presently before this Court is an adversary proceeding commenced by plaintiff-creditor Richard Sudol ("**Plaintiff**") against debtor-defendant Marek A. Drzensla, *aka* Marcus Drzensla *aka* Marcus Drzensla T/A Exotic Customs ("**Defendant**").  Plaintiff alleges Defendant's debt arising from a state court default judgment under the *New Jersey Consumer Fraud Act*, N.J.S.A. § 56:8–1 *et seq.*, is non-dischargeable under 11 U.S.C. § 523(a)(2)(A) because it was obtained by false pretenses, a false representation, or actual fraud.

The transaction underlying the state court default judgment relates to Defendant's repair of Plaintiff's automobile.  The parties agree that the following occurred:  Plaintiff turned the damaged vehicle over to Defendant; Plaintiff paid Defendant some money up front for the repair; Defendant demanded additional money for the repair, which Plaintiff did not pay; and Defendant never returned the vehicle to Plaintiff.  But those are virtually the only facts on which the parties agree. Moreover, neither party told a chronologically complete story at trial.  Nevertheless, the parties provided the Court enough facts to decide this matter.  The Court has pieced that information together as best it could for this Opinion, recognizing that there are gaps in the facts.  At the end of the day, this case turns on who the Court believes is telling the truth—Plaintiff or Defendant.

Pursuant to Federal Rule of Bankruptcy Procedure 7052, the Court issues the following findings of fact and conclusions of law.  To the extent any of the findings of fact may constitute conclusions of law, they are adopted as such. Conversely, to the extent any conclusions of law may constitute findings of fact, they are adopted as such.

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984 and amended September 18, 2012.  This matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) because it seeks a determination as to the dischargeability of a particular debt.  Venue is proper under 28 U.S.C. §1408.

## BACKGROUND

### A.  Pre-Litigation Events

The following facts set forth herein are based on the parties' testimony and trial exhibits:

1.      Plaintiff owned a 2011 Audi A4 Quattro ("**Audi**") that was involved in a collision with another vehicle in Fall 2009.

2.      Plaintiff filed a claim with his car insurance company.  The insurer provided an estimate ("**Insurance Estimate**"), dated November 25, 2009, which indicated the Audi was a "total loss" and, if the vehicle was repaired, that the total cost of repairs would be $7,045.14.  (Trial Ex. P1).

3.      The total loss value of the Audi was roughly $4,000.  The insurer issued Plaintiff a check dated December 1, 2009 in the amount of $3,733.68, which was the Audi's total loss value less Plaintiff's deductible ("**Insurance Check**").  (Trial Ex. P2).

4.      At that time, Defendant operated an auto body/custom repair shop called Exotic Customs in Rahway, New Jersey, as a sole proprietor.  It appears that Plaintiff and Defendant may have been friends or at least acquaintances.  Defendant previously did auto body work and painting for Plaintiff on the Audi as well as another vehicle.  Defendant never provided Plaintiff with written estimates for his prior work on the Audi or the other vehicle.

3

5.      Plaintiff contacted Defendant and asked if Defendant could repair the Audi for the damage from the accident.  The parties reviewed the Insurance Estimate together.

6.      Plaintiff and Defendant orally agreed that Defendant would repair the Audi for the damage from the accident.  However, the parties disagree on whether they reached an agreement on the price of the repair.  No written agreement or authorization exists for the repair.

7.      Plaintiff endorsed the Insurance Check to Defendant's shop and delivered both the Insurance Check and the Audi to Defendant.  (*See* Trial Ex. P2).  Plaintiff left the keys inside the Audi.

8.      The parties later communicated about the status of the repair, but they disagree on whether they discussed any additional repairs and costs.

9.      While Defendant had the Audi for repair, Plaintiff personally purchased and delivered parts to Defendant to use in repairing it.

10.     In Fall 2011, about two years after Plaintiff left the Audi with Defendant to be repaired, Defendant called Plaintiff and told him the Audi was ready to be picked up.

11.     At some point, Defendant asked Plaintiff for more money for the repair, including additional money for damage that was unrelated to the accident and therefore outside of the Insurance Estimate.  Plaintiff did not pay Defendant any additional money at that time, and the Audi remained in Defendant's possession.

12.     Eventually, Plaintiff received a document titled *Visual Damage Quotation*, dated September 19, 2011, from Defendant.  (Trial Ex. D1).  The *Visual Damage Quotation* reflected a total repair cost of $7,274.40, minus $3,588.70 that Plaintiff paid, with a balance of $3,685.70 remaining.  (*Id.*)  Again, this was around two years after Plaintiff delivered the Audi to Defendant.

13.    In December 2011 or January 2012, Defendant moved his shop from Rahway, New Jersey (the "**Rahway Lot**") to Lakewood, New Jersey.  Defendant never told Plaintiff about the move.

14.    Around the same time, the Audi disappeared from the Rahway Lot.  The parties have different thoughts on what occurred:  Plaintiff says he never removed the Audi and Defendant never returned it to him, while Defendant says he assumed Plaintiff retrieved the Audi.

15.    Plaintiff never paid Defendant any additional money, and Defendant never sued Plaintiff to obtain any additional money from the Audi repair.

16.    As of June 3, 2016, the Audi was titled to a third party.  (Trial Ex. D4).

**B.    Plaintiff's State Court Lawsuit**

17.    On or about November 2, 2011, Plaintiff commenced a lawsuit against Defendant in the Superior Court of New Jersey alleging that Defendant's conduct related to the Audi repair violated the *New Jersey Consumer Fraud Act*, N.J.S.A. § 56:8-1 *et seq.* ("**NJCFA**").[1]  (Trial Ex. P3, ¶5).  Specifically, the state court complaint alleges that the parties agreed Defendant would repair the Audi for $3,424.00, which Plaintiff paid, and that Defendant refused to return the Audi unless Plaintiff paid an additional $3,685.70.  (*See id.*, ¶¶ 2–4).

18.    Defendant failed to file an answer or other responsive pleading.  (*See* Trial Ex. P4 at 1).

19.    On February 27, 2012, the state court issued a letter opinion awarding Plaintiff a judgment for $13,856.50, comprised of $11,847 in treble damages plus costs and attorney's fees ("**State Court Opinion**").  (*Id.* at 2).  Specifically, the state court found that Defendant committed

---

[1] Plaintiff's state court complaint did not contain any legal citations. However, the state court found that Plaintiff brought his action under the NJCFA and that Plaintiff alleged Defendant committed a deceptive practice in the conduct of the business of an auto repair dealer as defined by N.J.A.C. § 13:45A-26C.2.  (Trial Ex. P4 at 1).

an "unlawful practice" under the NJCFA based on Plaintiff's uncontradicted testimony that Defendant neither provided Plaintiff a written estimate of the repair costs, nor obtained a written waiver of Plaintiff's right to a written estimate.  (*Id.*)  The state court further found that Plaintiff's loss of the Audi and the money Plaintiff paid for repairs (*i.e.*, $3,424.00 up front and $525.00 for parts Plaintiff provided) constituted an "ascertainable loss" under the NJCFA.  (*Id.*)[2]

20.     On August 8, 2014, six months after the State Court Opinion was issued, Defendant filed a document purporting to be an answer to the state court complaint.  (Trial Ex. D3).

21.     Notwithstanding Defendant's submission, the state court never vacated the State Court Opinion and Defendant never appealed it.

**C. Defendant's Bankruptcy Case**

22.     On April 6, 2015, Defendant filed a voluntary bankruptcy petition under Chapter 7 of the Bankruptcy Code.  (Case No. 15-16210 ("**Main Case**"), Docket No. 1).  Defendant's Schedule F lists Plaintiff as a creditor with a $13,856.50 undisputed, unsecured claim incurred "[i]n 2012 resulting from 2009 agreement to repair vehicle".[3]  (Main Case, Docket No. 1 at 16).

23.     On July 6, 2015, Plaintiff filed an adversary complaint ("**Complaint**") alleging three Counts.  (Adv. Pro. No. 15-02022 ("**Adv. Pro.**"), Docket No. 1).  All three Counts seek to have Defendant's $13,856.50 debt to Plaintiff declared non-dischargeable, though none of the Counts alleges a specific statutory basis for non-dischargeability under the Bankruptcy Code.

24.     The First Count alleges, *inter alia*, that Defendant knowingly and falsely represented to Plaintiff that he would repair the Audi for $3,524.00, which was a material

---

[2] The parties did not submit an order or judgment from the state court, but they do not dispute that the state court entered judgment based on the State Court Opinion.  Though the parties referred to the state court judgment in their arguments, the Court in this opinion will distinguish between when the parties are relying on findings from the State Court Opinion and when they are relying on the state court judgment itself.

[3] Defendant subsequently filed an Amended Schedule F.  (Main Case, Docket No. 6).  However, this amendment has no bearing on the matter presently before the Court because it did not alter or affect Plaintiff's claim.

representation intended to deceive Plaintiff. (*Id.*, First Count, ¶¶6–7). The First Count further alleges that Plaintiff reasonably relied on that representation when he: (1) agreed that Defendant would repair the Audi for $3,424.00;[4] (2) paid Defendant that amount; and (3) delivered the Audi to Defendant. (*Id.* ¶¶8–9). The First Count continues that Plaintiff purchased and delivered parts to Defendant for use in the repair. (*See id.* ¶10). The First Count asserts Defendant never repaired the Audi. (*Id.* ¶11). Instead, it asserts Defendant converted the Audi to his own use and disposed of it, resulting in Plaintiff's loss of the Audi, the money paid to Defendant, and the money expended on parts. (*Id.* ¶12).

25.    The Second Count alleges that Defendant's material, false representation constituted a false pretense calculated to deprive Plaintiff of property in violation of the NJCFA. (*Id.*, Second Count, ¶¶2–3).

26.    The Third Count alleges that Defendant's material, false representation was intended to deceive Plaintiff to induce him to turn over money and property to Defendant in violation of the NJCFA. (*Id.*, Third Count, ¶¶2–3).

27.    On October 26, 2015, Defendant filed an answer to the Complaint ("**Answer**"). (Adv. Pro., Docket No. 10). He denied, *inter alia*, that: (1) he told Plaintiff he would repair the car for either $3,524.00 or $3,424.00; and (2) that he told Plaintiff he was unable to find parts necessary to repair the automobile. (*Id.*, First Count ¶¶6, 8, 10).

28.    Defendant also alleged certain affirmative defenses, including: (1) Defendant cannot be liable for breach of contract because there was no "meeting of the minds" on the price in the purported contract; (2) Plaintiff failed to plead non-dischargeability with sufficient particularity under Federal Rules of Bankruptcy Procedure 7008 and 7009; and (3) Plaintiff's fraud

---

[4] The discrepancy between the amount Defendant represented he would pay ($3,524.00) and the amount Plaintiff agreed Defendant would repair the Audi for ($3,424.00), as alleged in the Complaint, is discussed in footnote 9, *infra*.

allegation is insufficient under 11 U.S.C. § 523(a)(2)(A) because the state court judgment was not

on the merits and Plaintiff cannot prove Defendant committed an intentional bad act. (*Id.*,

Affirmative Defenses, ¶¶9, 12, 15).

29.    The Answer contains no counterclaims.[5]

30.    On July 17, 2015, the Court entered an Order granting Defendant a discharge under

11 U.S.C. § 727 ("**Discharge Order**"), which excluded Plaintiff's claim.[6]  (Main Case, Docket

No. 13).

**D.  The Trial**

31.    The Court conducted a one-day trial, which included opening statements and

closing arguments from counsel and testimony from both parties.  Neither party introduced any

witness other than himself.

*Plaintiff's Testimony*

32.    Plaintiff testified that Defendant agreed to repair the Audi's accident damage for

the amount of the Insurance Check and nothing more.  Plaintiff believed that, by endorsing the

Insurance Check to Defendant, he was paying for the repairs to the Audi in full.

33.    Plaintiff contended he expected the Audi might be ready the following Spring.

However, Plaintiff testified that when the parties spoke "on and off" about the progress of the

---

[5] On April 28, 2016, Defendant filed a *Motion to Approve Filing of First Amended Answer with Counterclaim Pursuant to FRBP 7015 and D.N.J. LBR 7015-1* ("**Motion to Amend Answer**").  (Adv. Pro., Docket No. 22).  Debtor admitted at the hearing on the Motion to Amend Answer that the purpose of the amendment and counterclaim was to question the amount of the state court judgment.  After failing to provide any case law to the contrary, Debtor conceded that this Court has no ability under the law to change the amount of the state court judgment and that the amendment sought was futile.  On May 17, 2016, the Court entered an Order denying the Motion to Amend Answer.  (Adv. Pro., Docket No. 25).  Therefore, the Answer remains the operative responsive pleading in this matter.

[6] The *Explanation of Bankruptcy Discharge in a Chapter 7 Case* that accompanied the Discharge Order explained that Defendant's discharge does not include debts that the Court excluded or will exclude from discharge.  (*See* Main Case, Docket No. 13 at 2).  Because the instant adversary proceeding remains pending, the Discharge Order did not discharge Defendant's debt to Plaintiff that is the subject of this proceeding.

repair over the next few months, Defendant claimed various delays, including that Defendant had

trouble locating parts.  Plaintiff testified he purchased headlights and a radiator support for the

Audi repair and had them delivered to Defendant because of Defendant's trouble locating parts.

34.     Plaintiff testified that Defendant never said the Audi repair would cost more than

the amount of the Insurance Check and they never discussed extra repairs or additional costs.

35.     Plaintiff continued that two years later, in Fall 2011, Defendant told Plaintiff the

Audi was ready to be picked up.  Plaintiff testified he went to the Rahway Lot and saw the Audi,

which looked repaired, with the keys inside the vehicle.  Plaintiff asserted Defendant then asked

him for more money for the repair, but provided nothing in writing to reflect additional costs.

Plaintiff testified he became upset, told Defendant that was not their agreement, left the Rahway

Lot without taking the Audi, and immediately contacted counsel.  Plaintiff alleged he never

authorized Defendant to proceed with extra repairs.  Plaintiff further alleged that the only

documentation he ever received regarding outstanding repair costs was the *Visual Damage

Quotation* Defendant faxed to Plaintiff's attorney years after Plaintiff dropped off the Audi and

after Defendant said he completed the repair.

36.     Plaintiff continued that he later drove past Defendant's shop but did not see the

Audi.  Plaintiff did not indicate when this occurred.  Plaintiff added that Defendant never told

Plaintiff the Audi disappeared, and in fact Plaintiff only learned Defendant moved his shop a few

months after the move.  Plaintiff asserted that neither the Audi nor the parts he bought for the

repair were ever returned to him.  Plaintiff further testified that he never sold the Audi.

### *Defendant's Testimony*

37.     Defendant testified that Plaintiff, whom Defendant described as a friend, called him

and asked if the accident damage to the Audi could be repaired.  At first, Defendant testified that

Plaintiff gave him the Insurance Estimate during this initial conversation.  However, after prompting by counsel, Defendant corrected himself by stating he received the Insurance Estimate during a second conversation.[7]  Defendant testified that Plaintiff then brought the Audi to Defendant's shop.  Defendant alleged the parties did not discuss a price for the repair, and that he could not estimate the cost of the repair even though he had an estimating book.  Defendant specifically denied that he agreed to repair the Audi for the amount of the insurance proceeds or any other amount.  Defendant said he instead told Plaintiff he would try repair the Audio for the amount of the Insurance Check by using cheaper parts, including parts that Plaintiff would supply.  However, Defendant also testified that Defendant believed the Audi repair would cost "way more" than the insurance company was willing to pay and that the insurance adjuster simply stopped calculating the damage once the estimated repair cost exceeded the Audi's value.

38.    Contradicting himself yet again, Defendant then testified that he *intended* to do the repair work for the amount of the insurance proceeds.  However, once his counsel rephrased the question, Defendant backtracked and said he never agreed to do the job for that amount.

39.    Defendant later changed his story *again* and claimed he agreed to try to repair the Audi for half the amount of the Insurance Estimate's $7,045.14 total cost of repair.

40.    Defendant testified that Plaintiff said something like "we can do it," which Defendant took as approval to proceed with the repair.  Defendant admitted he and Plaintiff only had a verbal agreement for the Audi's repair, even though Defendant used written contracts with other customers.  Indeed, Defendant acknowledged that he was under an obligation to provide customers with written estimates before doing work.

---

[7] The Court notes that Defendant contradicted himself numerous times during his trial testimony.  The Court recounts those inconsistencies in this Opinion because they are essential to the Court's credibility determination.

41.     Defendant testified that he thought the Insurance Check was simply a deposit for the work to be done and that he told Plaintiff as much.

42.     Defendant testified that sometime after Plaintiff dropped off the Audi, Defendant told Plaintiff over the phone that the Audi had additional damage not caused by the accident. Defendant testified that he told Plaintiff the extra repairs would cost more than the amount of the Insurance Check Plaintiff already paid.  Notably, Defendant never testified that Plaintiff approved the extra work.  Instead, Defendant testified that he continued to work on the Audi because he believed Plaintiff would honor their "agreement."  Defendant described this "agreement" as (1) Defendant would try to complete the repair for the amount of the Insurance Check, but (2) if the repair costs exceeded the amount of the Insurance Check, Plaintiff would pay the additional amount.  The Court finds that Defendant's testimony is, again, inconsistent.

43.     Defendant claimed the repair took two years because he did it as a favor, and that Plaintiff told Defendant to take his time.

44.     Defendant continued his testimony, indicating Plaintiff owed an additional $3,865.70 upon completion of the repair.  Defendant claimed he asked Plaintiff for more money over the phone and that Plaintiff responded by asking Defendant to fax the invoice to Plaintiff's work.  At the time, Plaintiff worked at Home Depot.  Defendant testified that he faxed an invoice dated October 23, 2011 to Plaintiff at Home Depot on that date (the "**Invoice**"), which reflected a subtotal due of $2,123.50.[8]  (Trial Ex. D2).  Defendant testified that the Invoice was incomplete and inaccurate because it omitted certain labor costs included in the *Visual Damage Quotation* dated September 19, 2011.  Defendant gave no clear testimony as to when he believed he sent the *Visual Damage Quotation* to Plaintiff.

---

[8] The Invoice indicates it is "1st page of 2", but Defendant's trial exhibit includes only one page.  (*See* Trial Ex. D2). There is no evidence in the record of a fax transmission from Defendant to Plaintiff.

45.     Defendant testified that, meanwhile, the Audi remained on his property. Defendant stated he called and texted Plaintiff several times to ask when Plaintiff would retrieve the Audi and pay the outstanding bill. Defendant continued that Plaintiff confirmed receipt of the faxed Invoice, assured Defendant he would pay the full balance due, and never disputed the amount on the Invoice. However, Defendant also contradicted himself by testifying that he and Plaintiff did not communicate about Plaintiff paying the Invoice after Defendant sent it.

46.     Defendant testified that the Audi "disappeared" from the Rahway Lot while he was moving his shop to Lakewood. Defendant testified that the keys were sometimes left in the Audi so it could be moved around the Rahway Lot, which was ungated and wide-open to the public. Additionally, Defendant testified that he transferred the insurance and security cameras for the Rahway Lot to the Lakewood location by the time the Audi disappeared. Thus, at the time the Audi disappeared, the Rahway Lot was neither covered by insurance nor had any security cameras in place.

47.     Defendant said he thought Plaintiff towed the Audi away, contending Plaintiff did that before with another vehicle Defendant repaired. However, Defendant admitted he never asked Plaintiff about the Audi's disappearance. Defendant asserted he instead texted Plaintiff "thank you for taking the car away" because Defendant did not want to deal with the Audi during his move to Lakewood. Defendant provided no evidence of this text or any other communication between the parties. Defendant testified that Plaintiff neither responded to the text nor contacted Defendant about the Audi.

48.     Defendant conceded that someone could have stolen the Audi. But, Defendant never contacted the police about the Audi's disappearance, nor took any further action beyond his alleged text to Plaintiff.

49.     Defendant asserted that although he would not have returned the Audi to Plaintiff without receiving payment for it, he never converted the Audi for his own use.   Defendant contended that he did not collect on the outstanding Invoice because he and Plaintiff were friends, noting that other friends had taken Defendant for more than what Plaintiff owed.

### *Plaintiff's Argument*

50.     Plaintiff argued, *inter alia*, that the state court already adjudicated many of the issues before this Court, including whether the parties had a contract and whether Defendant's failure to provide a written estimate and obtain written authorization before doing repair work were deceptive practices.   Plaintiff contended that Defendant told Plaintiff he could and would repair the Audi for the amount of the Insurance Check to get Plaintiff to tender the Audi and the Insurance Check to Defendant.   Plaintiff alleged that the state court judgment was not appealed and is not dischargeable.

### *Defendant's Argument*

51.     Defendant made clear that he did not dispute the amount of the default judgment. Instead, he argued that it cannot be the basis for finding the debt non-dischargeable because the standard for non-dischargeability under the Bankruptcy Code is different than the standard for a deceptive practice under the NJCFA.   Defendant contended there was no meeting of the minds between the parties on the price of the repair, noting that Plaintiff alleged different dollar amounts when referring to the Insurance Check in his pleadings.   Defendant contended that failing to do the job for the amount of the insurance proceeds is not fraud, since he merely said he would try to do the work for that amount because of his friendship with Plaintiff.   Defendant denied that he intentionally deceived Plaintiff and asserted there is no proof that Defendant converted the Audi.

Defendant argued that Plaintiff failed to meet the standard of showing Defendant violated 11 U.S.C. § 523(a)(2)(A).

52.     At the close of the hearing, Plaintiff's counsel represented that Plaintiff sought to proceed under Section 523(a)(2)(A) only, effectively withdrawing all other Counts.  The Court reserved decision and directed the parties to submit proposed findings of fact and conclusions of law as they relate to Section 523(a)(2)(A).

53.     Both Plaintiff and Defendant filed their proposed findings of fact and conclusions of law.  (*See* Adv. Pro., Docket Nos. 31–32).

## LEGAL ANALYSIS

### I.     The Parties' Credibility

Both parties' stories had gaps, leaving this Court to determine whether Plaintiff or Defendant is more credible and which story makes more sense in light of the testimony given and the evidence presented.

Defendant challenged Plaintiff's credibility by pointing out that Plaintiff testified the Audi appeared repaired in Fall 2011, while the Complaint alleged Defendant never repaired the Audi. Defendant also highlighted, numerous times, that Plaintiff did not always allege the exact same dollar amount when referring to the Insurance Check in Plaintiff's pleadings.  However, the Court finds these inconsistencies to be *de minimis*.  First, whether Defendant in fact repaired the Audi is irrelevant to whether there was fraud in the making of the debt.  Plaintiff testified that Defendant never returned the Audi, so it makes sense that Plaintiff does not know whether it was actually repaired.  Second, Plaintiff *did not* testify at trial that Defendant agreed to repair the Audi for a specific dollar amount.  Instead, Plaintiff consistently and credibly testified that Defendant agreed to repair the Audi *for the amount of the Insurance Check*.  In fact, when asked about the

inconsistent dollar amounts on cross-examination, Plaintiff did not appear to even know that the amounts in his pleadings were inconsistent.  The relatively small difference in the amount of the Insurance Check reflected in Plaintiff's uncontested trial exhibit versus the amounts listed in his pleadings appears to be mere scrivener's error.[9]  Moreover, the exact dollar amount of the Insurance Check is irrelevant to the outcome here because the State Court Opinion clearly established the amount of Defendant's debt.  Therefore, the Court finds these minor inconsistencies have no effect on Plaintiff's credibility.[10]

Whereas Plaintiff's inconsistencies are *de minimis*, Defendant's inconsistencies are irreconcilable and material.  Defendant gave the Court at least three different stories about his agreement to repair the Audi.  First, Defendant testified that he never agreed to do the repair for the amount of the Insurance Check—because he believed the Audi repair would cost "way more" than the insurance company was willing to pay—but nevertheless told Plaintiff he would try to do the work for the amount of the Insurance Check.  Second, Defendant testified that he *intended* to do the work for the amount of the Insurance Check.  Then Defendant changed his story, *yet again*, and testified that he agreed to try to do the work for half of the Insurance Estimate's $7,045.14 total cost of repair.  Which one of Defendant's stories does Defendant expect the Court to believe?

Further damaging Defendant's credibility is Defendant's testimony that he could not estimate the cost of the Audi repair before starting the work.  The idea that Defendant was unable to estimate repair costs is extremely suspect, particularly since state law requires him to do so and

---

[9] Specifically, the Complaint alleges that Plaintiff's insurer paid Plaintiff $3,424.00 for the Audi and that Defendant agreed to repair the Audi for $3,524.00.  During Plaintiff's cross-examination, Defendant's counsel asserted that Plaintiff's interrogatory answers (not provided to the Court) stated that the parties agreed Defendant would repair the Audi for $3,421.00.  At most, these numbers reflect a difference of just over $300 from the undisputed amount of the insurance check, which is $3,733.68.  (*See* Trial Ex. P2).

[10] The Court notes that Defendant's own assertion regarding the amount of the insurance check is also wrong.  Defendant's *Visual Damage Quotation* reflected that Plaintiff paid Defendant $3,588.70, but the undisputed amount of the insurance check is $3,733.68.  (*Compare* Trial Ex. D1 and Trial Ex. P2).

Defendant testified he did so for other customers.  (*See* N.J.A.C. § 13:45A-26C.2(a)3).  Indeed,

Defendant had an estimating book for that very purpose.  Moreover, Plaintiff gave Defendant a

copy of the Insurance Estimate, which both indicated that the total cost of repair for the Audi would

be $7,045.14 and itemized the necessary work.  (Trial Ex. P1).  Defendant clearly had an estimate.

Thus, any suggestion that Defendant did not know approximately how much the Audi repair would

cost rings hollow.

The foregoing does not suggest that the parties failed to agree on the price of the Audi

repair.  Instead, Defendant's testimony suggests that Defendant misled Plaintiff into believing

Defendant could and would repair the Audi for the amount of the Insurance Check.  According to

Defendant's *Visual Damage Quotation*, the total cost to repair the Audi was $7,418.68, which is

$373.54 more than the insurer's estimated total repair cost and almost double the total loss value

of the Audi.  Plaintiff specifically testified that Defendant agreed to fix the Audi for the amount of

the Insurance Check.  Why would Plaintiff agree to pay more when the Insurance Estimate stated

the value of the totaled vehicle and the amount the repair should cost?  No one presented any

evidence suggesting anything special or particularly valuable about the Audi that might help this

Court understand why Plaintiff would want to pay more than the insurer's estimated total cost of

repair, which was $7,045.14.  Nor would Plaintiff's hypothetical agreement to pay more make

sense without some explanation, *e.g.*, "It was my only vehicle and it was cheaper to fix than to

purchase a new one."  Plaintiff never took that position, and Defendant never offered any facts to

support such a suggestion.  Likewise, Defendant provided no evidence—such as phone, text or fax

records—that he told Plaintiff about the additional repair costs and that Plaintiff agreed to pay

them. Defendant's theory that Plaintiff agreed to an open-ended arrangement to pay whatever

Defendant billed at the end of the repair makes no sense.

Next, Defendant's purported actions after he demanded additional payment from Plaintiff are simply bizarre. Defendant testified that he thought Plaintiff picked up the Audi, but Defendant also conceded that the Audi could have been stolen. Defendant admitted the keys were sometimes left in the Audi and that the Rahway Lot was completely unsecure at the time the Audi disappeared. Clearly, such practices could have led to the Audi being stolen. Inexplicably, Defendant did nothing to confirm that Plaintiff actually picked up the Audi, even though confirmation certainly would have helped Defendant recoup any money Plaintiff owed him.[11] Instead, Defendant would have the Court believe that: (1) Defendant told Plaintiff it would cost more than the amount of the Insurance Check to repair the Audi; (2) Plaintiff picked the Audi up from the Rahway Lot without paying for it; and (3) instead of demanding payment, Defendant thanked Plaintiff via text for taking the Audi. Interestingly, Defendant never pursued Plaintiff for payment. Defendant failed to even tell Plaintiff that Defendant moved the shop from Rahway to Lakewood. How did Defendant expect Plaintiff to pay if Plaintiff did not know where the business was located? None of this makes sense.

Further, Defendant's suggestion that Plaintiff still owes money for the Audi repair is absurd. Defendant failed to appeal the state court judgment. Defendant's Schedule F lists Plaintiff's $13,856.50 claim as undisputed. (*See* Main Case, Docket No. 1 at 16). Defendant failed to list any claims against Plaintiff in Schedule B of the petition. (*See* Main Case, Docket No. 1 at 9–11). Defendant never asserted any counterclaims against Plaintiff in the Answer. (*See* Docket No. 10; *see also supra* n.5). Defendant testified unequivocally at trial that he does not dispute the

---

[11] Defendant raised at trial that the Audi was titled to a new owner. (*See* Trial Ex. D4). However, Defendant failed to produce the new owner as a witness or even offer a certification as to how the new owner obtained the Audi. Therefore, the Court finds this information fails to support Defendant's version of events or the inferences Defendant suggests to the Court. It merely shows someone else now owns the Audi.

amount of the debt.  Therefore, even if Defendant believes he has a claim or setoff against his debt

to Plaintiff, Defendant waived any such claim by his actions both in the state court proceeding and

in his bankruptcy case.

Lastly, Defendant's demeanor at trial exacerbated his narrative inconsistencies.  On direct,

counsel repeatedly prompted Defendant to correct unhelpful testimony and to be specific about his

conversations with Plaintiff.    On cross-examination, Defendant's testimony was often

unresponsive and at times argumentative.    Defendant's answers and demeanor strongly

demonstrated to this Court that he was not being completely honest and forthcoming.

For all these reasons, the Court finds that Defendant is not credible and Plaintiff's version

of the facts, though perhaps incomplete, is closer to the truth.  Therefore, the Court finds that

Defendant agreed to repair the Audi for the amount of the Insurance Check, even though Defendant

knew at the time that the repair would cost more.

## II.    *Res Judicata* **or Claim Preclusion**

### A.  Standard

The affirmative defense of *res judicata*, also referred to as claim preclusion, requires that

the party asserting it bear the burden of showing it applies.  *See U.S. v. Athlone Indus., Inc.*, 746

F.2d 977, 983 (3d Cir. 1984); Fed. R. Civ. P. 8(c).  Application of the claim-preclusive aspect of

the *res judicata* doctrine requires:  (1) a final judgment on the merits in a prior suit; (2) involving

the same parties or their privies; and (3) a subsequent suit based on the same causes of action.

*Purter v. Heckler*, 771 F.2d 682, 690 (3d Cir. 1985); *Gibbons v. First Fidelity Bank N.A. (In re*

*Princeton-New York Inv'rs, Inc.),* 255 B.R. 376, 387 (Bankr. D.N.J. 2000) (Gambardella, J.).

In New Jersey, the doctrine of *res judicata* applies to default judgments.  *See Mattson v.*

*Hawkins (In re Hawkins)*, 231 B.R. 222, 229–30 (D.N.J. 1999); *Gallo v. Tooley*, No. 06-02523

DHS, 2007 WL 1071945, at *2 (Bankr. D.N.J. Apr. 3, 2007) (Steckroth, J.); *see also In re Crispino*, 160 B.R. 749, 755 (Bankr. D.N.J. 1993) (Stripp, J.) ("Under the doctrine of res judicata, if the debtor's current action is upon the same claim or demand as the original action and involves the same parties, then this action is barred even though the debtor defaulted in the prior action.").

However, the United States Supreme Court made clear in *Brown v. Felsen*, 442 U.S. 127, 138–39 (1979) that the bankruptcy court has exclusive jurisdiction to determine the dischargeability of a debt. *See id.* ("[T]he bankruptcy court is not confined to a review of the judgment and record in the prior state-court proceedings when considering the dischargeability of respondent's debt."); *see also In re Graham*, 973 F.2d 1089, 1095 (3d Cir. 1992) (finding that applying claim preclusion to a non-dischargeability action based on a prior tax court judgment "would take the issue of non-dischargeability for tax debts tainted with fraud out of the hands of the bankruptcy court" in contradiction of *Felson*). Thus, a pre-petition state court judgment has no *res judicata* effect on a subsequent dischargeability proceeding in the bankruptcy court. *Gallo*, 2007 WL 1071945 at *2; *Hawkins*, 231 B.R. at 231. The default judgment merely established the existence of the debt. *Hawkins*, 231 B.R. at 231.

  B.  *Analysis*

Plaintiff argues that the findings in the State Court Opinion should be *res judicata* here and compel a finding that the debt is nondischargeable. However, the case law makes clear that the state court default judgment does not preclude this Court from evaluating dischargeability of the debt. *See Gallo*, 2007 WL 1071945 at *2; *Hawkins*, 231 B.R. at 231. Moreover, the State Court Opinion found only that Defendant failed to comply with the NJCFA because he neither provided Plaintiff with a written estimate of the cost of repairs, nor obtained a written statement signed by Plaintiff waiving Plaintiff's right to a written estimate. (*See* Trial Ex. P4 at 2). Therefore, to the

extent Plaintiff contends the debt is non-dischargeable under 11 U.S.C. § 523(a)(2)(A) because the

State Court Opinion found Defendant violated the NJCFA, this Court rejects such an assertion.

However, the Court's analysis does not end here.

### III.   Non-Dischargeability Under 11 U.S.C. § 523(a)(2)(A)

*A. Standard*

Section 523(a) provides limited exceptions to the general dischargeability of debts of

eligible debtors. *De La Cruz v. Cohen (In re Cohen)* (*"Cohen II"*), 106 F.3d 52, 55 (3d Cir. 1997),

*aff'd sub nom. Cohen v. de la Cruz* (*"Cohen III"*), 523 U.S. 213 (1998). Section 523(a) establishes

sixteen types of debts that are non-dischargeable under the Bankruptcy Code. *Cohen II*, 106 F.3d

at 55.

Section 523(a)(2)(A), which is the pertinent provision here, provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title
does not discharge an individual debtor from any debt—

. . . .

> (2) for money, property, services, or an extension, renewal, or refinancing
> of credit, to the extent obtained by—

>> (A)    false pretenses, a false representation, or actual fraud. . . .

Section 523(a)(2)(A). Section 523(a)(2)(A) prevents discharge of "any debt" respecting "money,

property, services, or . . . credit" that the debtor fraudulently obtained, including treble damages

assessed on account of the fraud. *Cohen III*, 523 U.S. at 218.

Section 523(a)(2)(A) conditions non-dischargeability on the plaintiff's ability to establish

that the debt in question was obtained as the result of the debtor's false pretenses, false

representations or actual fraud. *Green v. Salvatore (In re Salvatore)*, No. 10-16449/JHW, 2011

WL 2115816, at *10 (Bankr. D.N.J. May 26, 2011) (Wizmur, J.). The plaintiff must prove these

elements by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Salvatore*, 2011 WL 2115816 at *10. Specifically, the plaintiff must show: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reliance by the other person; and (5) resulting harm." *Canby Foods, LLC v. Presta (In re Presta)*, No. 15-17322 (JNP), 2017 WL 3326016, at *2 (Bankr. D.N.J. July 17, 2017) (Poslusny, J.) (citing *Lewandowski v. Moeller (In re Moeller)*, No. 09-17417 (GMB), 2014 WL 1315854, at *5 (Bankr. D.N.J. Mar. 31, 2014) (Burns, J.)); *De La Cruz v. Cohen (In re Cohen)*, 191 B.R. 599, 604 (D.N.J. 1996), *aff'd by Cohen II*, 106 F.3d 52, *aff'd by Cohen III*, 523 U.S. 213.

    B.  *Analysis*

Based on the record, trial testimony, evidence, and the Court's credibility determination, the Court finds that Plaintiff has carried his burden under Section 523(a)(2)(A) of showing by a preponderance of the evidence that Defendant obtained the Insurance Check, custody of the Audi, and the repair parts from Plaintiff through fraud. Specifically, the Court finds that: (1) Defendant represented to Plaintiff that Defendant would repair the Audi for the amount of the Insurance Check; (2) Defendant knew his representation was false, since he (a) believed the repair would cost "way more" than the $7,045.14 total cost of repair set forth in the Insurance Estimate, and (b) later invoiced Plaintiff for more than the amount of the Insurance Check; (3) Defendant intended Plaintiff to rely on the representation; (4) Plaintiff relied on the representation, as evidenced by his delivery to Defendant of the Insurance Check, the Audi, and the repair parts; and (5) Plaintiff was harmed because he no longer has the Insurance Check, the Audi, and the repair parts. *See Presta*, 2017 WL 3326016 at *2. Based on the foregoing, Defendant's debt to Plaintiff, including treble damages, costs and attorney's fees, is excepted from discharge under Section 523(a)(2)(A). *See*

*Cohen III*, 523 U.S. at 223 (finding that under New Jersey law, the petitioner's entire debt for fraudulently obtained rent payments, including treble damages and attorney's fees and costs, was non-dischargeable).

## **CONCLUSION**

For the foregoing reasons, the Court finds that Defendant's debt to Plaintiff in the amount of $13,856.50 arising from the state court judgment is non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

An appropriate Order will enter.

DATED:  March 6, 2018

_Stacey L. Meisel_
Honorable Stacey L. Meisel
United States Bankruptcy Judge